Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning everyone and welcome to the 11th Circuit. This is Judge Rick Grant and I'm happy that you've all joined Judge Marcus and Judge Carnes and I here even in these unusual circumstances. We're glad to be here with you to help explain your cases. With that, let's get started on our first case. We've got Wright v. Sumter County Board of Elections and Registration. Mr. Rayl, is that the best way to say your name? It's Riley, Your Honor. Riley. Okay, well I'm glad I asked. It's not phonetic. Thank you and may it please the court. I'd like to reserve five minutes for rebuttal. At issue in this case are two questions of legal burden. First, the black community constitutes the total population majority in Sumter County and maintains a registration advantage over the white community countywide. It should have been the plainest burden to show below why a group that has registered at high rates in the past is prevented from voting at high rates in the future. But the district court erroneously placed the burden on the county to prove that turnout rates are not caused by the effects of past discrimination. Its reliance for this rule on case law addressing majority white jurisdictions where a majority white voting bloc has been proven was erroneous and necessitates reversal. Second, the court found it to be guesswork whether the plainest illustrative plan was an improvement on the challenge scheme. It is not self-evident that a proposal to replace the two at-large seats with one remedial seat of a mere 5% increase in black voting age population is a step forward. Mr. Riley, this is Judge Marcus. One of the questions that I have sort of at the outset you could help me with is what is it that we're actually reviewing? As I saw it, we had a final judgment from the district court. We had an appeal where we consolidated all three appeals. We had a remand at the end and a final determination by the district court based on the report prepared by the second expert in the case, Dr. Groffman. Am I reviewing the whole record here? What you're reviewing, Your Honor, is the liability ruling that is incorporated into the final judgment and forms the basis of the permanent injunction. So the relief that we're requesting is reversal of the judgment and vacature of the permanent injunction. I guess that brings me to my question. Why am I reviewing only the liability judgment when I have both liability and remedy resolved by the district court? I guess the essence of my question is how do I separate liability from what we call remedy when the remedy is inextricably bound up with the question of liability? You draw that line, Your Honor, because the liability ruling is the predicate for the remedial phase. Without the liability ruling, there would have been no remedial phase at all. And similarly, without the liability ruling, there would be no final judgment in the plaintiff's favor and there would be no permanent injunction in the plaintiff's favor. While it's true that an appellant can appeal from remedial rulings and remedial specific issues and raise those on appeal, we are not raising those issues on appeal. We are not arguing that even if the liability ruling was correct, then the remedial ruling was incorrect. Some cases do that. In some cases, you have that posture. I guess yours and I'm raising my question is we have said repeatedly, we've said it in Nipper, we've said it in Burton versus the City of Belgrade, we've said it in Nipper. The inquiries into remedy and liability cannot be separated. The district court must determine as part of the Gingell's threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenge system. So it seems to me the burden rested with the plaintiff to establish that it could come up with a plan that worked and if it flunked out on that, then it flunked out on Gingell's one. On the other hand, if it succeeded in that and in the other two Gingell's factors, then it may well prevail in the case. But I guess what I don't know is why you are drawing the line at the water's edge and you say, look, just at liability, not at remedy. When you concede as you must, that remedy is bound up with the question of Gingell's one and liability. What am I missing here? Well, Your Honor, I think what we're saying is that all those cases that you cited support our position because they show that before that liability order was ever entered, the court needed to find that a remedy could be fashioned and it's finding in this regard is erroneous because it placed the burden in the wrong place, placed it on the county. And I think holding aside the burden, I'm asking a different question. The burden simply says who's obliged to ultimately carry the burden of persuasion on the three Gingell's factors, the totality, the circumstances, the Senate factors, etc. And there's no doubt the plaintiff bears that burden. I'm asking a different question. I'm asking whether when we determine whether they have met their burden, we look simply at the record at liability or we look at the whole record, including what the district court found based on the second expert's findings. We think, Your Honor, our primary argument is that you look just at the record at liability precisely because it's a liability inquiry. The plaintiff cannot make up for the showing on liability by moving into the future into the remedial phase. Now, as we've also argued, we think that the record at the remedial phase also supports us because it actually undercut the You want us to look at the report of Dr. Groffman for the purposes of undermining and impeaching McBride, but not look at it to see whether the plaintiff has met its burden on Gingell's 1? Is that the essence of your position? It's our alternative position. Our primary position is that you shouldn't look at the report of Dr. Groffman at all because it doesn't help the plaintiff meet his liability burden at all. It happened after the liability ruling. It wasn't relied on in the liability ruling. There were no findings about it for the liability ruling, and if the court had ruled the other way, as it should have, none of that would have ever happened. So that's our main argument. I think your argument would have been, just speaking for myself, perhaps stronger if the district court had never recommissioned a new expert, an expert that everybody agreed was first-class in this area. But once he did, and once he performed the studies that he did, and once he concluded that there was a plan, in fact he said there were a number of plans that solved the problem, and the district court specifically selected the third one, MAP-3, and entered a final judgment specifically including that remedy, not the original McBride remedy. How do we ignore all of that in determining whether or not the plaintiff has met its burden on Gingles, particularly Gingles 1? I think the reason you don't look at that, Your Honor, as again our primary argument, is because of the threshold requirement that is very clear in this court's precedent, as well as in the Supreme Court's precedent, including most recently Abbott v. Perez. And under that precedent, this has to be brought up front. It has to be dealt with as an initial matter, and bringing in an expert after the fact, charging the expert's fees to the county, is not a basis for the plaintiff to overcome his burden. Because remember, even at the remedial phase, the plaintiff tried multiple, made multiple attempts to provide a remedy, and the district court found them all wanting. I'm curious, did you say to the district court when he picked Dr. Groffman here that you can't do that, you don't have the power to consider an additional remedy that may come out of an additional expert, you are with McBride, that's the beginning and end of this case, and you're not free to do that? Did you tell him that? We didn't tell him precisely that. What we did say is we didn't think that the MAP 3 or any of the special master's MAPs were adequate remedies. We said that we thought none of this should be happening. We actually argued in the hearing that the court should reconsider its the remedial phase undercut it. We have preserved our challenges to the liability ruling. I don't think a party, an appellant, should be required to challenge the MAP. Because remember, at that phase, we just wanted our appeal. We had multiple limited purposes remands. We wanted to get it back up to this court to challenge the liability ruling on appeal, and remember... Right, but you see the problem that I'm having is this court remanded this case twice to the district court. The last time was on May 16th, 2019, and at that time we remanded it for the district court precisely to look at and examine the remedy question. That was the reason that Wright sought remand, and this court, a different panel than the one year before, said, yeah, go back to the district court and gave the district court the power to review that matter and to come up with a remedy, a plan, if it could. So wasn't the district court free based upon the remand that we entered to do exactly what it did here? I agree that it was empowered to do what it did. I disagree that it has that meaning. The reason that the plaintiff asked that the case be remanded wasn't to allow him to supplement his showing on the liability phase. It was for election administration purposes to make sure that the question of the November 2020 election was resolved before the end of the appeal and to allow those mechanisms to work themselves out for... I guess what I'm really asking is, based on the remand, if the district judge was troubled with the determination of remedy, that is to say whether there was a viable plan that would ameliorate the problem as he thought, why couldn't he elicit further evidence on remedy, which is exactly what he did? He could elicit further evidence on remedy. What we're saying is that that doesn't go back in time to salvage an erroneous liability ruling. Even then, we dispute and we disputed below that the remedy establishes that. Dr. Groffman found that there are only three opportunity districts in his MAP-3, and our position all along has been that there's an equal opportunity in four districts, including the two at-large seats. Keep in mind, Your Honor, that we have three arguments against the liability ruling on this appeal. We have Roman... No, I understand that. I don't mean to belabor the point. I'm just trying to figure out what's properly before me, and it seems to me you do want to use Groffman's report for the purposes of undermining McBride, and I think it does, but you don't want to allow it to be used substantively, even though the district court adopted the second expert's MAP and made that part of its final judgment. That's the only trouble I have with squaring what you're saying. Right, and I appreciate the consistency. It only seems inconsistent because we are making tiered alternative arguments precisely because we want to make sure we have all our bases covered. I suppose we could have stopped our remedial brief at the place where we said the court shouldn't consider it. We did argue on the alternative that it supports us. It wasn't with prejudice to our principal position that the court shouldn't consider it, and also I would emphasize that we don't think that even the special master's work supports the liability ruling, but if I can, I would like to turn to the argument, our lead argument, on Roman numeral one, which concerns the burden and the question of turnout, which is independent of the remedial issues that Your Honor has established a causal connection between the at-large seats and the alleged inequality of opportunity. It erroneously held that it must assume a causal connection between the election results and past discrimination, but section two affords equal opportunity, not equal success. It guarantees participation, not outcomes. The theory of Thornburg against Jingles is one of submergence. The majority, by virtue of its numerical superiority, can regularly defeat the choices of minority voters. Here, there is no submergence. The black community holds the advantage in every relevant demographic category, total population, voting age population, and voter registration. The Fifth Circuit Solace decision describes this precise scenario and holds that a plaintiff bringing a claim for a racial group with a registration advantage faces an obvious difficult burden to prove that the group's inability to elect results from white block voting. That burden should have applied here, but the district court instead placed the burden on the county. This was a legal error. It affected the liability ruling, and again, it's unrelated to any of the issues at the remedial phase. Plaintiff's responses to this argument are not persuasive. First off, the plaintiff contends that in this case, the registration advantage is about a 48 and a half percent black registration to a 46 percent white registration and isn't nudged over that majority line, but this place is formed over function. The black community is a majority in the functional sense because no one is contending that any group other than the black or the white communities are impacting elections in Sumter County. In fact, we criticize the plaintiff's expert below for focusing solely on the black and white communities, and we're missing that the other voters are too small to matter. They're even too small to do analysis on, and they're not turning out in any meaningful sense to vote in these elections, and so they can safely be ignored. If that is true as to the polarized voting elements that the plaintiff is required to show, it is equally true here. Furthermore, the district court actually made findings on this point that are adverse to the plaintiff. On 36 of its opinion, it said the problem for African-Americans in Sumter County is not the number of voters, but how often they turn out to vote. The court did not think that the advantage here was illusory or insignificant. Furthermore, the real question here, which is really a jingles prong three question, is one of the white majority voting block, and we see this in this court's decision in Meek against Metropolitan Dade County, where the court took its time and carefully analyzed the record and found a majority voting block in a coalition. Although that case went the other way and the plaintiff was successful in that appeal, it supports our position because none of the analysis in that case makes any sense under the plaintiff's reasoning. The very emphasis of the case was in finding a not irrelevant majority voting block if there's two minutes remaining. Thank you. Mr. Riley, this is Judge Grant. I've got a question for you. For purposes of argument, let's say that we agree with what you're saying on this point. What actually happens at this point in September of 2020 if we were to reverse the judgment and vacate the permanent injunction? What happens on the ground in your county? It depends in part, Your Honor, on when that decision comes out. Obviously, if you're inclined to reverse, we would favor a quick ruling for that effect. There is not a record built up on exactly where we are in the process, but we are many weeks out from the election, and I don't think it's too late for the map in place. Even if it is, what would happen, Your Honor, is there would still be an automatic reversion to the challenge scheme, and that would very likely trigger a requirement of special elections to occur after the November 2020 election, and the reason for that is that the redistricting law at issue here contains a requirement that the members, the representatives of the district, main continuous residents in the district, once those lines change, incumbents will end up not in their districts, and under Georgia law, there would likely be some kind of a special election before the next redistricting. So there is clearly a practical effect, in at least two meaningful respects, Your Honor, of a particular, if you're inclined to reverse, to issue an order to that effect even before an opinion that would allow these processes to play out. As you know... The time has expired. This is Judge Barnes. I'd like to ask a question, too, after you answered Judge Grant's question. Sure. I was just finishing up. As you know, the 2018 elections were canceled this decade. The 2012 elections were canceled this decade. That's a lot of not voting in the school board elections. We would like to move on in this county. Judge Barnes? Yes, and yes, Clark, if you could give him his remaining rebuttal time, because I'm eating into it right now. Are you of a mind that we should wait to issue our order, and we're actually going to have a fairly good test of all of this in November, and if it turns out that we look at Sumter countervoting and we see that, as you suggested, we don't have the records totally extrapolated from the Stacey Abrams race last time where Sumter County went for Stacey Abrams, but if we look at Sumter County after this election and see that we can determine that black voters did vote, did use their majority clout, and did vote for the candidate of their choice, is that going to be a fact that really when we sort all this out gives us some insight into whether this extra little bit of handicapping and help that they are perceived to need now may not be needed at all if we see, in fact, in this election that they actually do go out in the numbers that they're represented. Is that an approach the court should take? Should we wait and see what's going to happen in the next election? Your Honor, I don't think it would be a wise approach, principally because, again, we're looking at a possibility ruling that was issued over two years ago. Secondly, because the court already has that information, and I think your reference to the Stacey Abrams countywide win in Sumter is a good point to make on that. There are lots of these elections that the district court simply disregarded, and one of our arguments, of course, is that they should have been included in the mix. I don't think that the court is going to be much differently situated after the November election, and I think the cost to the county in sitting here for another several weeks waiting for another election to pass, possibly having to undergo special elections if we ultimately prevail, it really outweighs the advantage that might, in some cases, be drawn from that course of action. So I respectfully submit that that wouldn't be the wise resolution of this case. Let me follow up on Judge Carnes's question, if I can, for a moment. Just explaining to me where we are. You started to earlier. There will be an election in November. The way it now stands is there are seven single-member districts, and will that be what's voted on in Sumter County School Board? Unless this court intervenes, that's correct. Right, so we will actually see the result, won't we? You would see the results from those races, but remember that the analysis here under Section 2 isn't simply whether there can be a better plan, but whether there's an equal opportunity under the challenge. Though I do understand that the issue is opportunity, not result. But I want to emphasize here, I mean, when we're talking about this experiment, it does kind of bypass that relevant point, which is, does the plan that enjoys the presumption of legal validity, which was enacted by the legislative body of the state of Georgia, offer an equal opportunity? And especially as to our arguments number one and number three, the elections in November are certainly, as to one, are not going to be that relevant. Number three, the relevance is marginal. I would think it's a very much healthier argument, because let's assume that the black voters in Sumter County are going to come out in full force, and they're going to exercise the voting clout they have, the superiority. I would think armed with that argument, you can come back and say, we don't need to put the thumb on the scale and give extra help here to a group that has shown when it wants to, it can vote. Maybe it doesn't care about Board of I'm surprised at your approach, because I would think actually it would be helpful to your argument. Well, I agree with you, Your Honor, but my point is we already have that. We have that in the Stacey Abrams win. We have that in... But we don't, those numbers aren't extrapolated. We don't, we can't, we're looking at it, we think we probably know what it means, but we haven't really had an expert go through those numbers. Well, that's a fair point, and I guess what Your Honor is suggesting is there would actually be another remand in this case, which I think by my count would be the fourth or fifth, to go back and have new expert reports and new discovery, and what we're saying is we have a basis to win on the legal burden today, and we don't think the court should wait when we have every reason to win this case today. Do you anticipate that there will be, you may shudder when I ask this question, another round of redistricting that's necessary after the 2020 census? I would assume so, Your Honor, and we don't know what the 2020 census results are going to show. That is a while from now, especially with the delays in the census due to the COVID-19 crisis. We don't know when those results are going to come out, and as I said before, we have more immediate interests in this county, and so the redistricting is well out. We have an election. We have the possibility of special elections. Again, I would urge the court, if it's inclined to reverse, to issue an order promptly so that the county can quickly revert to the plan and hold the elections under the proper plan. Is there time to do that? Your Honor, I don't think the record is clear on that. It would be speculation for me to assure you that we can. This is a small county. I'm not sure where the ballot printing is, but we're well enough out where I think the ballot printing could happen. There could be truncated notice requirements, so I think that possibility very much remains. What you see, the irony here is, if we were to accept your remedy here, enter an order vacating the county, and then the county would be in the position where it would have to scramble to see if it could put the eggs that had been splattered back together again, have a vote. The odds are you wouldn't be able to do that in 35 days or less than 35 days, so there would be no vote again in the fall of 2020. Then, as Judge Grant points out, I think, and it's a very interesting point, you're going to get a census. Within a year, you're going to have completely new figures. The remedy would probably have to be redrawn still again. The irony is, these folks could be without the opportunity to vote for school board representatives for a very, very long period of time. Doesn't that all suggest moving more quickly rather than less, and addressing the substance of the issue sooner rather than later? Well, I definitely agree with the last point that you made. I think I do dispute one premise in everything you said there, which is that if it is too late for the November 2020 election, that there won't be voting in the school board. I don't think that would be the case, Your Honor. I think that if it were too late, the county would proceed under the special master's plan, even if the court vacated and reversed, and then it would be a question of whether special elections need to occur. Perhaps in December or January, there are special election dates on Georgia's calendar, and that would certainly occur before... What plan is this when you say the special master's plan? Do you mean Groffman's Map 3 or going back to McBride? No, I mean Groffman Map 3 that the county was ordered to use. That is, in effect, the county is planning for the election under that map, and if it were too late, I'm quite positive that the county would conduct voting in November 2020 under that map. I don't think that the county would. I can't be sure on this, Your Honor. Again, there's not a record. I'm speaking off my personal knowledge, and that's always dangerous for an appellate lawyer, but my best understanding is there would still be voting in the school board. The county wants there to be voting on the school board, and it would be under the special master's plan in December, and then we would be doing potentially special elections before the redistricting, and again, I submit that's not the best way to proceed, but it may be how Georgia law works in this case. Thank you. And I know we're taking you over, but I have one more question, and I'm sure we'll give the other side equal time. I assume that we rule for the plaintiff and agree with the district court. There is liability. The remedial plan that ultimately came up with, while McBride may have been deficient, Groffman's number three, I assume we think, is not. Are you in any way challenging this ultimate remedial plan that the district court enacted? Are you saying, I haven't read anything in your briefs where you're challenging that for any reason as being something that you think is vulnerable to an attack? Yeah, I think you're right, Your Honor. Let me just repeat what it is we are challenging, so that we're clear. I know what you're challenging, but I'm saying if you get stuck with map three, if we go with the plaintiff and the district court, you now got map three. I just want to make sure you're not challenging anything about that particular map. Not as independent from the liability ruling, that's correct. We're not raising, we're not arguing that even if the district court was right on liability and everything it said in that liability ruling, that somehow the remedial decision was still wrong. If you were to affirm the liability ruling, then you wouldn't have to go in and reanalyze it, because that's not what we're challenging. What I'm looking at is this map now seems to be, map three seems to really have gone kind of the other direction in terms of arguably diluting white voters a bit, but you're not challenging that, is that correct? We're not raising a white vote dilution challenge, Your Honor, to the remedial map, that's correct. All right, thank you. If there are no further questions, I Thank you. That brings us to Mr. Sells, and please make sure that Mr. Sells has equivalent time added to his time. Yes, Judge. Thank you, Judge Grant, and good morning. May it please the court. My name is Brian Sells, and I represent the affilee, Reverend Mathis Cursewright, Jr. This court should affirm the judgment of the district court, because the ultimate finding of vote dilution on which that judgment rests is not clearly erroneous. It is more than adequately supported by substantial evidence in the record, and most of that evidence is either undisputed or uncontroverted. It is undisputed, for example, that black voters are zero for three in the at-large school board elections that this court has already held to be the most probative, and that voting was highly polarized along racial lines in each one. It is undisputed that African-Americans remain grossly underrepresented in other offices elected countywide in Sumter County. In fact, no African-American has ever won a contested election for countywide office in Sumter County. It is undisputed that there is a long and extensive history of discrimination against African-Americans that touched directly on black political participation, and it is undisputed that the effects of that discrimination still linger. Mr. Sells, just as Judge Carnes, there is some dispute. That's kind of the heart of the defendant's argument, and I sort of have a two-part question. One is, Marengo County, which was issued in 1984, assumed at that time that a lack of success, even when there was black voter strength, suggested the remnants of prior discrimination were present. We're 36 years past that now. I'm going to give you two questions. My first question is, at what point can we no longer indulge that presumption? At what point can we say that the reason when a black group of voters who are in a majority don't vote is simply attributable to voter apathy, not to the remnants of discrimination? How do we know when we've reached that point? My second question, which is a little more pertinent to what we have to do, is we have to review these decisions. In Salas, the Fifth Circuit upheld a district court ruling that said, I think the reason Latino voters didn't vote is apathy. And the Fifth Circuit said, okay, no clear error. Our judge did not decide it was apathy. Our judge, in a similar conclusory fashion, because he really had no evidence to work with, conclusions all he could give, said, I think remnants of past discrimination are here. How does an appellate court, how do we, are we essentially rubber stamps for whatever district courts say? Because there's really no evidence one way or the other. That's my two questions. Sure, Judge Carnes, let me say a couple of things in response to your question. I think there are really two ways to respond. First, of course, there's law on the issue. And this panel is bound by 11th Circuit and before that in pre-split Fifth Circuit law that touches on this. And there is plenty of binding precedent on this. Thornburg v. Jingles says that the essence of a Section 2 claim is that a certain law, practice, or structure interacts with social and historical conditions, and that courts must take a case and ultimately, at some point, this is going to get down to a factual question. Well, okay, so on the facts, this is not a case where there is a shred of factual evidence that black voters have overcome the history of discrimination that lingers even today. And the evidence is full of contemporaneous evidence of that discrimination. And I can point you to some of that evidence in the record to Judge Carnes. I think the most important piece of evidence in this case is Plaintiff's Trial Exhibit 33, which maps the turnout in Sumter County elections over the last 20-some years, back to 1996. That's as far back as the data goes. And you will see that over the entire course of that time span, black participation has been depressed. This is not a case where... Excuse me, this is Judge Grant. Has voter registration increased among black people during that time period in county? We don't have the same time series of data in the record with respect to voter registration. It's not there. But my point on the turnout, Your Honor, is that this is not a case where, for example, in 2008, black voters came out and were able to elect candidates of their choice and then fell back. There has never been a moment of parity in Sumter County. But also, there's more. The discrimination in Sumter County is not ancient history, but present-day reality. The court found, and it's not clearly erroneous, and it's frankly not disputed, that there is persistent racial separation in religious, civic, and social organizations in Sumter County. But how does that affect the ability of a black voter to choose his or her home and go vote? And, you know, what I'm leading to is a question I ask proposing counsel. If we see in this next election, and we are going to have a census and this is going to go on, but if we unravel what happened in the Stacey Abrams election and see that black voters did go out and vote in force for her. If we look at this next election and we can determine that black voters in this election did use their majority clout to vote. Sumter County went for Hillary Clinton last time, went for Stacey Abrams. If we see that when they want to, black voters can get to the polls and vote, what do we do with that information? Do we have special rules then for elections that they're not as interested in? If that happens, isn't a big part of your argument deceited that past discrimination means that black voters will not go out to vote if the next results of the election turn out as I've hypothesized? No, Your Honor. I don't think that is accurate. First of all, November elections are not the same as May elections. Well, this is going to be a November election for the board too, right? Well, that's true, but if you were to reverse the elections for school board would be held in May. And there is findings in the record that black turnout is much lower in May. Let's assume the school board stays in Sometimes you get to those down-ballot things people aren't interested. So they vote and a hundred percent of those who turn out vote in the presidential election or the gubernatorial election. When they get down to the Board of Education, eh, maybe they don't vote, they don't care. Do we have to suddenly then because of that now attribute that to past discrimination or just voter disinterest in the particular race? Well, you're hypothesizing facts that are not in the record. That's what hypotheses are. I just want to push back on that a little bit because those are all things that could have been established or attempted to be established by the county's expert and it chose not to. And the county simply submitted these election returns and that the court made findings as to the probative value of those election returns and the court's election returns are not clearly erroneous. But I think the court would have to take a very nuanced look at the voting patterns in the Stacey Abrams race, for example, and determine whether that that would mean that a school board election would present African-American voters with the African-American voters comfortable and free to go out and vote on the governor's race, the presidential race or whatever, that suddenly we get to the Board of Education. How can we then tie that unwillingness to vote in their full numbers to discrimination versus just a decision? I don't care about the Board of Education race. Well, let me give you an example, Judge Connors. It could very well be true that white voter polarization is less in elections for, say, president or governor than for school board where the elected officials are going to raise their taxes or, you know, that is an entirely possible outcome. It would not mean that black voters are responsible for their victories in casting votes for black preferred candidates in November. I take it in any event, counsel, that if we were to proceed that way, the whole thing would have to go back on remand to the district court for more fact-finding. We wouldn't be able, as an appellate court, to find facts from the results of either the Abrams gubernatorial election or from the voting patterns in November of 2020, right? It would have to go back. It would. I would point out, Your Honor, that we actually asked the court to reopen the record to permit the very analysis that you're suggesting, Judge Connors, and the county opposed that motion, and so in the two years we've had since 2018, there has been no analysis of the 2018 election. The district court, excuse me, the county, in this case, in its briefing in the appellate court, cited to those election returns and said, ah, look, the election returns prove our point, and so we asked the district court to allow the very kind of analysis that you're suggesting, and so I don't think that the court should remand now for the analysis that the county has opposed all along, Your Honor. Let's see, I do want to address the county's Titan standard argument. That's their argument that the plaintiff should have been subject to a heightened standard. As a factual matter, the record does not establish that African Americans are the plurality of registered voters in Sumter County, and that's because there are a significant number of voters in Sumter County who did not provide their racial identification when they registered. According to the latest data available to the district court, there were 456 registrants whose race is unknown to the Secretary of State, and that number is more than enough to make white voters the plurality on Sumter County's voter list, and to the extent that the county believes that the plurality or majority status of African Americans is that issue. Is that figure that you just shared with us in the record? Yes, Your Honor, it is at ECF 166-1. Thank you. So if you added the 406 votes that we don't know the racial identity to white voters, I thought that the black voters outnumbered white voters more than 406. You're saying that it's that close? The difference is 277 voters between black and white. 456 is well more than enough to cover that gap. So it's possible that African Americans are the plurality, but it is also quite possible that white voters are the plurality. What we really have as a practical matter is almost a dead tie, dead heat, right? They're pretty much 50-50. Yeah, I don't think there's any dispute about that. It's close, but the county's argument I think tries to split those hairs. But as a legal matter, there is no alternative legal standard on the precondition that applies when a minority group constitutes a slight plurality or even a slight majority of white voters, and the Fifth Circuit's opinion in Salas that the county relies on expressly rejects the idea of trying to fashion some alternative precondition. Subsequent courts have interpreted Salas in just that way. I would point to the Eighth Circuit's recent decision in Missouri State Conference of the NAACP versus Ferguson Florissant School District. The Eighth Circuit reads Salas as we do in expressly rejecting that kind of alternate standard that the county is arguing for here. Well, sure, I think it's fair to say that there was no automatic presumption that where a minority group has a majority, they cannot ever set out a successful voting rights claim, but I do think it's a little more complicated than that, isn't it? Well, no, I don't think it is, at least according to existing law, Your Honor. There is no case law other than Salas that remotely supports the county's position that the district court in this case applied the wrong legal standard, but even if there were... When you say the wrong legal standard, what are you referring to? Well, that is the county's argument, as I understand it, that the district court applied the wrong legal standard to the third jingles factor, and their argument is that under Salas, a different legal standard applies when a minority group makes up a plurality of the registered voters, and there is no law, in fact, to support that. But even if there were... Counsel, I took the county's position to be that the district court had erroneously placed the burden of persuasion on the descendant rather than on the plaintiff. Did the district court do that? So, the district court's placing the burden of persuasion is in line with the court's... this court's decision in Marengo County and other cases, but that's under the Fifth Senate factor, Your Honor. Right. The reason... That's why I raised the question, because when I looked at the district court order, the first one, that he entered in March of 18, I read the district court clearly to place the burden as to each jingles factor on the plaintiff. He says that's the factor one, the plaintiff must show, the plaintiff has, it's the factor two, right, must show, he has, and so on. So, at least literally, the language that he uses placed the jingles burdens on the plaintiff, not the defendant. Did he place the burden, in fact, on the defendant here? I don't think so. I don't think so, because even under the Fifth Senate factor, right, there's law that says that once you come up with... once a plaintiff shows depressed political participation and socio-economic disparities, it doesn't need to prove any causal nexus. But here, the district court made findings that there was a causal nexus. It's very clear on page two of the court's opinion that the present-day disparities that result from historical discrimination affect political participation. That is the causal nexus that is presumed under the Fifth Senate factor, but it was actually proven in this case with testimony. And what that does is it creates a rebuttable presumption, and the district court produced evidence to counter that, but they didn't. There's really no dispute about that in the record, and I don't think I see any dispute as to the Fifth Senate factor. But back to what I'd asked before, though, it's a finding of fact, but based on what fact? It's a finding of fact that because, unfortunately, black citizens of Sumter County continue to be poorer and less educated, that discrimination is the cause of that versus something else. I mean, I'm not finding any facts here that make it. It's just what essentially your argument is, it's sort of a permanent conclusion that we must always adhere to 40 years later, 80 years later, that if, in fact, these socio-economic consequences are there, we will have to infer always that that is attributable to No, I don't think that is my argument, Your Honor, and I didn't get to finish answering your earlier question about what other evidence is in the record. There was testimony in the record, well, in addition to the findings that the court made regarding present-day racial and social segregation, present-day racial animus in the community, present-day socio-economic disparities that result from the past discrimination, present-day depressed participation. In addition to all of that, where the court draws the causal link, there was testimony from the Dr. McBride that links lower socio-economic status with lower political participation, and there were a number of witnesses on day two of the trial, all of whom had experience in local politics, and they identified the problems that education, income, and wealth presents to black political participation in Sumter County. The testimony was, in essence, that because black voters don't have the education, because they went to segregated schools, because they don't have the wealth because of employment discrimination, they don't have the level of civic participation that the white community has even today. And again, that's day two of trial, testimony from Michael Coley, Kelvin Pless, Dr. John Marshall, board member Alice Green, and board member Edith Green. There's lots of testimony linking those things, and I want to emphasize that, Judge Carnes, this is not ancient history that we're talking about here. We're talking about present-day discrimination, and, you know, it's tempting, I think, to view what happened in the 1980s as ancient history, but I want to point out that the testimony of Sam Mahone, for example, who graduated Sumter County High School in 1964, he is, if you read his testimony, very clearly traumatized today based on the experiences that he felt growing up in Sumter County. The plaintiff, Reverend Wright, graduated high school in Sumter County in 1969. He was elected that was described in Bell versus Southwell as horribly racially motivated. Same thing for Michael Coley. Edith Green and Alice Green, their first jobs out of high school were teaching in segregated schools in and around Sumter County. This is not ancient history, Your Honor. These people are not that old. They're present members of the community, and their experiences with discrimination may seem like ancient history from sitting in Atlanta, but that's not what the district court found, and the district court's findings linking that history to present-day depressed political participation is not something that this court should substitute its view for. Those findings are not clearly erroneous, and they are entitled to substantial deference. No question, no question, there's a shameful past in Sumter County and many places in the South, and there's no question it is shameful. My question is at what point we find a connection between that and a witness. Do those witnesses you talk about, do they vote, or are they frightened to vote because of what happened to them? No, the witnesses didn't testify that they can't vote. What they testified is that in campaigning and trying to get people out to vote, that rank-and-file voters, if you will, oftentimes have to prioritize the burdens of daily living because of the abject poverty in Sumter County, or that they simply don't have the extra time in their day to read up on the candidates or to even know that an election is happening in Sumter County in May because the candidates don't have the money, for example, to advertise the way that white candidates do. These are effects that still linger, and there may come a day when a judge finds that the effects are not attributable, but that's not the case here. One last factual question which you may not be able to answer. Judge Sands, a very fine judge, indicated in his district, in his order, one of them, that black voting, I guess, black voting age population and maybe also registration, but it's increasing, that the black population is increasing relative to the white population in Sumter County, suggesting the poor might eventually take care of itself if the numbers, you know, get large enough. Is there anything in the record that helps us? Is that supported by the record or is that just Judge Sands' kind of seat-of-the-pants knowledge of the situation? Your Honor, there is nothing in the record on that point. Judge Sands doesn't fight to anything in the record. I searched the record to see if I could support that. There is nothing about trends that would support that issue. I do, I think my, even with a little extra time, I'm getting close to the end, so I want to address some of the questions that came up for Mr. Riley specifically, Judge Grant. I think you asked kind of what happens now, and Mr. Riley said there's nothing in the record, but I think there is information in the district court record on the remedial phase, both at the hearing and in some of the briefing. Ballots have already gone out. Voting in the November election in Georgia started on September 15th. The ballots went out to UOCAVA voters, military and overseas voters, last Saturday, and so voting is well underway. I can tell you that all seven seats are on the ballot. In November, there are black candidates up for all seven seats, and you know, this court could certainly throw out the results of that election, but there is not time to resend ballots and have an election held under the At-Large scheme in November. Under the plan is the expectation that how many black preferred candidates will be victorious in those seven races? Well, yes, the plan anticipates that there are three seats where black voters have an opportunity to elect, and there's a fourth seat where black voters sort of have a long-shot chance, and you know, we don't... Is that the precinct where it's only 60.13% of black voters? Is that the one that's the long shot? I don't have those numbers off the top of my head, Your Honor, but it is in Professor Groffman's report. I'm just curious about that. The numbers are so high for all of these 62%, 61%, 60.53, 60.13. I'm just... I guess I can read Groffman's report. It seems to me they would all... I don't know why one would be a long shot versus all of them would seem to be a pretty good chance for black voters this time. Isn't that true particularly with the election being in November rather than May? Right, that is one of the reasons why Judge Sands chose to move the election from May to November, and I would point out that the county did not object to that. It's not something that the plaintiffs advocated it, but the county did not object to the move. Let me ask this question of you if I can, Mr. Sells. We've got to determine whether or not the district court clearly erred in making findings about vote dilution and particularly each of the three Gingell's factors enumerated by the Supreme Court. More precisely, the preconditions enumerated by the Supreme Court in Gingell's. As to Gingell's one, we have said repeatedly that in order to answer that question, we must determine whether there is a reasonable opportunity created by the new plan. In so far as we make that review, are we limited to the record that occurred before the district court when McBride testified, or are we obliged to look at the subsequent findings in the remedial determination by the district court that occurred when he called the new expert? Sure, Your Honor, let me make two points in response to your question. Number one, I want to push back a little bit on the premise that the discussion of the availability of a remedy is under Gingell's one. I think that under this court's en banc decision in Nipper and under the Supreme Court's recent decision in Abbott, the discussion of the availability of remedy is something held for the totality of circumstances. But setting that aside, to answer you more directly, this court is reviewing the district court's final judgment, and the final judgment is based on the entire record, including the remedial phase. And I would also point out that the district court explicitly bifurcated the case without the county's objection, I believe, and so it was entirely reasonable for the court to delay entering its final judgment until after it had, in fact, entered a remedy. The bifurcation order, by the way, is in the appellee's supplemental appendix, tab 147. So to answer your question, I think the entire record is before the court, and that record shows that the availability of a viable remedy is not even a close question in this case. Not a close question insofar as you look at McBride. Well, it is not a close question if you consider the entire record. I think if you look at what the court found with respect to Dr. McBride's illustrative plan that was offered for purposes of the first jingles factor, his findings there are not clearly erroneous. There was one plan, and the court found, based on the increase in black population, the decrease in white population, and McBride's testimony that, based on statistical analysis, that it would provide a meaningful opportunity to elect. Two minutes remaining. Yeah, I think based on the evidence in the record and the court's findings, even with respect to just McBride's illustrative plan, that the court's finding is not clearly erroneous. Well, doesn't Groffman undermine what McBride said? If you look at his conclusion, particularly paragraph 95, I'm reading from Groffman's report, he says specifically that, and I quote, on the other hand, based upon past elections and observed differences in among black and white communities, it is also implausible to expect a black candidate of choice of the African-American community to have a realistic chance of election in the nonpartisan contest for the school board in a district that is only barely above 50% black VAP, at least if the minority candidate is not already a sitting incumbent or in a district where other factors of the sort identified may facilitate success. Based upon that, the district court, in his order of 129-20, seems to have shifted his gear, and he references MAP-3, and he says, makes reference to the fact that in MAP-3, the majority VAPP district was 60.13, 60.53, 61.49, and 62.42. These percentages are significant, Groffman found, and no party has objected that a BAV of 60.2 is generally sufficient to give black voters realistic opportunity to elect their candidate of choice. Then he has a very interesting footnote, and I'm going to read it to you because I want your help with this. He says in footnote 13, previously the only testimony Plano provided was that 54.5% would likely be sufficient. Defendants then argued, presumably based on one district's election data, that 69% was necessary, but Professor Groffman has clarified that a vote of 69% is not necessary for black voters here to have a meaningful opportunity. But it seems to me that Groffman undermined the McBride finding, which was pegged to a BVAP of 54.5 and suggested you had to have something perhaps as much as at least 60%. So if all we were looking at is perhaps there is clear error, I'm not sure, but in any event the subsequent findings by Groffman undermine the notion that it would be sufficient at 54.5, don't they? I don't think they do. I mean they may cast a shadow of a doubt on McBride's conclusion, but I don't think that they undermine it completely. Dr. Groffman does not. Well they undermine it. Your point is it doesn't amount to clear error. Yeah, Dr. Groffman doesn't address the viability of the plaintiff's illustrative plan, which was offered as a least change plan. It was not offered as the best plan we could draw. And so I don't think it directly undermines Dr. McBride's plan. Dr. Groffman uses the same method of evaluating the performance of the various plans. As we point out in our supplemental brief, he analyzes a few different elections than Dr. McBride did, and so he comes up with some slightly different numbers. But he uses the same methodology, and I don't think anything in Dr. Groffman's report indicates that the district court's in its March 18th, 17th order is clearly erroneous. There's substantial evidence, and it's not just the 54% BVAP. It's also the 38% white voting age population. That's a substantial decrease. It was a greater white voting age population decrease than it was a black voting age population increase. And so the gap between black and white is quite substantial. It goes from three percentage points, roughly, in the at-large seat to about 16 percentage points in Dr. McBride's remedial districts. And the court concludes that that gap, in essence, could result in different electoral outcomes. And that makes a lot of sense. It's certainly not erroneous. Thank you. Sure. I am out of time. Unless the court has other questions, we will respectfully ask that the court affirm the judgment of the district court that the at-large seats on Sumter County's election plan for members of the school board where black voters, black children, are 85% of the student population. That violates Section 2 of the Voting Rights Act. Thank you. Mr. Riley, you're back up for five minutes. Thank you, Your Honor. Just a quick couple of points in rebuttal. First of all, there's definitely evidence in the record supporting Judge Sands' observation that there is a continuous trend upward in the black voting-age population and black percentages generally. In the record, there was a motion for judicial notice of the American Community Survey census data at Docket 164. The plaintiff actually opposed that motion at Docket 165. There was further briefing on 167, and the court granted that motion at Docket 189. Judge Sands, who we do think is a good judge, even though we disagree with some of his conclusions in this case, did not just say that with no evidence in the record. Second, the district court certainly placed the burden on the county to demonstrate that the low voter turnout of the black community is not the effect of prior discrimination, and that's clear on pages 25 and 26 of the decision. The plaintiff, I think, correctly points to case law on this subject, but the plaintiff misreads that law, and part of the reason he does that is because he's ignoring the case from 1979 that's binding on this court called Cross v. Baxter. And that court made clear that as part of the initial burden that the plaintiff bears is to establish, among other things, a disproportion in registration. And so we see why the Salas decision is consistent with the Marengo County decision, is that when there's a registration advantage or even an equality of registration, there's definitely not a disproportion of registration. And bear in mind that in the Salas decision, there was substantial evidence of the effects of prior discrimination that are actually more directly linked to voter participation than here. Among other things, the Mexican-American voters in the Salas case had a 41% illiteracy rate, and yet the court said that the registration demonstrated that the Hispanic voters, I'm quoting from page 1556, are not deterred from participation in the political process because of the effects of prior discrimination, including unemployment, illiteracy, and low income. Furthermore, once, if the plaintiff fails to meet the burden of establishing a disproportion in voter registration, then the burden is still on the plaintiffs, and we agree with Judge Grant that it's not a per se bar, and we would follow the Salas decision here, as well as Judge Higginson's recent concurring opinion, which we think is very thoughtful and there's still a possibility, but the evidence has to be directly linking this low turnout with past official discrimination. Two minutes remaining. Thank you. And what we heard from the plaintiff is not evidence of that direct linkage. Again, in Salas, there was much better evidence because of the illiteracy rates, and also because there they had an argument about migrant working conditions. The plaintiff's intention that this is simply a rubber stamping of the factual findings misreads the Salas decision, and again, the Higginson concurrence recently issued, we think is very persuasive on this point, misreads the Salas decision because the factual findings that are really at issue there are about the migrant working conditions, and it is true that the Salas decision may have come out the other way if the district court has made different findings establishing that the migrant working schedules provided an external barrier that meets the plaintiff's burden, but we have nothing like that here. We don't have any contention that there's any bar to participation, and we see that in the November elections, and the plaintiff's contention that those elections don't tell us anything is mistaken. At page 17 of his brief, the plaintiff himself contends that the Democratic primary, 81% of the voters in Sumter County are African-American, which means that the Democratic Party in the county is controlled by the African-American vote. If there's an equality of opportunity in November, there's an equal opportunity in May, there's no barrier. What the plaintiff is talking about in this case are private choices. The plaintiff wants equal opportunity for success, and that is not what the Voting Rights Act guarantees. I do have another question. This is Judge Grant. The plaintiff asserted that the county opposed discovery or analysis related to the 2018 election. Is that correct? That's correct, Your Honor. We submitted that the case should be decided based on the liability ruling, and we didn't want to make it on this. There's really two possibilities in this unique set of circumstances. One is that there is polarized voting in the Stacey Abrams race, and the black preferred candidate won. The other possibility is that there isn't polarized voting, and then that cuts against the plaintiff's case on cohesion. We don't need experts to tell us that. The only possibility where that election could help the plaintiff is if there were polarized voting and Stacey White voters in Sumter County. That cuts against the evidence in the record that is mentioned on page 17 of the plaintiff's brief. No one really thinks that that's happening, and so the evidence stands on its own, and again, we want a prompt resolution of these issues because there's a legal error affecting this decision that should be reversed, and it should be done so promptly. There are no further questions. We respectfully request reversal. Thank you. Thank you both. We really appreciate your careful and lengthy arguments. We appreciate that a lot on this complicated case.